**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**


ALLSTATE INTERIORS & EXTERIORS, INC.
          Plaintiff,

        v.                                    C.A. No. 09-283-ML

STONESTREET CONSTRUCTION, LLC
          Defendant, Third-Party Plaintiff,

        v.

WEYBOSSET HOTEL, LLC
FIRST BRISTOL CORPORATION and
J. KARAM MANAGEMENT
          Third-Party Defendants.


**DECISION AND ORDER**

Mary M. Lisi, Chief United States District Judge.

        This litigation arose from a hotel construction and renovation project (the "Project") in Providence, Rhode Island.  The case was originally filed in this Court by a subcontractor on the Project, Allstate Interiors & Exteriors, Inc., ("Allstate"), against general contractor Stonestreet Construction, LLC ("Stonestreet") for "an outstanding balance due and owing" in connection with a subcontract between Allstate and Stonestreet.  Allstate Complaint ¶ 8 (Docket # 1). Stonestreet, which asserted counterclaims against Allstate, also brought third-party claims against the owner of the Project, Weybosset Hotel, LLC ("Weybosset"). Allstate, however, is only a minor player in this litigation, the core of which lies in the claims which Stonestreet and Weybosset have asserted against each

other.   Those claims were litigated before the Court in a trial without a jury, after which the parties submitted extensive posttrial memoranda. The Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a) are set forth below.

### I. Procedural History[1]

On June 26, 2009, Allstate filed a complaint against Stonestreet, seeking payment of $244,725 for labor and materials it provided to the Project. On September 3, 2009, Stonestreet filed its answer and it asserted a counterclaim, in which it generally alleged that Allstate failed to perform work pursuant to the subcontract agreement between the parties.  On September 14, 2009, Stonestreet filed a third-party complaint against Weybosset for breach of contract, breach of good faith and fair dealing, unjust enrichment, tortious interference with contractual relations, and indemnification. According to the third-party complaint, Weybosset failed to make payment to Stonestreet for sums due under the construction contract (the "Contract") between the parties, "including sums that may be due for Allstate's work on the Project," Third-Party Complaint ¶ 10 (Docket # 9). Stonestreet also asserted that it "is entitled to payment from Weybosset before Stonestreet is required to pay Allstate."  Id. ¶ 12.   While Stonestreet's complaint did not specify the amount it sought from

---

[1]

Other aspects of the procedural history of this case have also been discussed in some detail in this Court's Memorandum and Order denying Weybosset's motion to dismiss Stonestreet's third-party claims against it.   Allstate Interiors & Exteriors, Inc. v. Stonestreet Constr., LLC, No. C.A. 09-283-ML, 2010 WL 695808 (D.R.I. Feb. 24, 2010).

Weybosset, Stonestreet was essentially seeking the difference between the payment to which Stonestreet believed it was entitled under the Contract, and the amount it was actually paid by Weybosset, or approximately $1.5 million.

Specifically, Stonestreet alleged that, instead of paying Stonestreet sums due under the Contract, Weybosset contacted "certain of Stonestreet's subcontractors on the Project, making representations and negotiating with those subcontractors, paying subcontractors discounted amounts, and interfering with Stonestreet's subcontractor relations." Id. ¶ 29. Regarding the indemnification claim, Stonestreet asserted that "Weybosset's failure to pay Stonestreet caused Stonestreet to breach its subcontract with Allstate and/or other subcontractors on the Project," and that Stonestreet was entitled to indemnification by Weybosset for damages sustained from such breaches. Id. ¶ 32.

Although Allstate's claims were resolved by payment in full shortly after commencement of this litigation, Allstate elected not to dismiss its complaint in light of Stonestreet's continuing counterclaims.[2] On November 12, 2009, Weybosset filed a motion to dismiss the third-party complaint for "lack of an independent basis of jurisdiction." Mot. Dismiss 1. Following a hearing on January 21, 2010, this Court denied Weybosset's motion on the ground that Stonestreet's claims against Weybosset were "inextricably

---

[2]

The Court notes that dismissal of Allstate as a party would have destroyed diversity as the jurisdictional basis of this litigation.

intertwined" with the claims that fell in this Court's diversity jurisdiction. <u>Allstate Interiors & Exteriors, Inc. v. Stonestreet Constr., LLC</u>, No. C.A. 09-283-ML, 2010 WL 695808 at *4.

The parties engaged in extensive discovery, in the course of which Stonestreet amended its third-party complaint by adding First Bristol Corporation ("First Bristol") and J. Karam Management ("JKM") as defendants in connection with Stonestreet's tortious interference claim. (Docket # 47). Stonestreet alleged that First Bristol had a substantive role in the negotiations between Weybosset and Stonestreet's subcontractors, and that payments to the subcontractors were made by checks written from JKM's accounts.

Weybosset, on its part, restated its counterclaims against Stonestreet for breach of contract, indemnification (with respect to Stonestreet's contractual obligation to pay its subcontractors), breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty (alleging that Stonestreet failed, upon receipt of payment from Weybosset, to hold monies in express trust for its subcontractors.) (Docket # 56).

On April 8, 2011, Weybosset filed a motion for partial summary judgment with respect to $1,016,499 in subcontractor costs that Stonestreet sought to recover under the Contract, but which Weybosset had already settled by direct payment of $893,521 to Stonestreet's subcontractors. (Docket # 92). Following a hearing on October 4, 2011, the Court took the motion under advisement after indicating to the parties that it would grant Weybosset's motion, at least, in part. Following the parties' unsuccessful

-4-

attempt to settle the case, the Court granted Weybosset's motion with respect to the $893,521 it had paid to the subcontractors. The Court reserved all other issues for trial.

Subsequently, the Court granted a joint motion by Allstate and Stonestreet to submit their claims and counterclaims against each other by written submission for determination after the claims between Stonestreet and Weybosset had been decided. Stonestreet and Weybosset also agreed to have the case heard by this Court without a jury. The Court conducted a ten-day trial, during which the parties presented eleven witnesses and more than 160 exhibits. The parties filed extensive posttrial memoranda on May 25, 2012, and further responses on June 29, 2012.

## II. Factual Background

Weybosset owns certain property located in Providence known as the Hampton Inn & Suites (the "Property"). The construction project at issue in this case involved the renovation of an existing 11-story historic building and the construction of a matching 10-story addition. Following a bidding process, Stonestreet was awarded the job of constructing and managing the Project. The operative document in this litigation is a November 2007 construction agreement (the "Contract"), Ex. 1, between Stonestreet and Weybosset, pursuant to which Stonestreet was to serve as the construction manager and provide general contractor services to improve the Property. Because Stonestreet's bid of $12.2 million exceeded Weybosset's budget by approximately $1 million, Weybosset sought to reduce costs through "value engineering," *i.e.* by using

-5-

less expensive construction methods and materials, for example, the use of brick veneer instead of real brick and employment of non-unionized subcontractors.

The Contract between Weybosset and Stonestreet is the A121 "Standard Form of Agreement between Owner and Construction Manager (where the Construction Manager is also the Constructor)"(the "A121"). Ex. 1 SS038790 - SS038804. Section 1.2, titled General Conditions of the Contract, provides that "[f]or the Construction Phase, the General Conditions of the contract shall be the AIA Document A201," which is incorporated by reference.  Document A201 (the "A201") is attached to the Contract,  Exhibit No. 1, SS0038805 - SS038838, together with Exhibit No. 1 thereto, which specifies the "Final GMP" [Guaranteed Maximum Price] for Stonestreet's work on the Project, id. at SS038840, and the post bid estimate for the Project, id. at SS038841 - SS038846. Additional exhibits to the Contract include the Project Schedule, Exhibit No. 2 at SS038847 - SS038849, the List of Architectural Drawings and the Architect's Project Manual, Exhibit 3 at SS038850, Stonestreet' Qualifications and Assumptions, Exhibit No. 4 at SS038851 - SS038858, and a Contractor's Letter issued by Stonestreet to the lender of the construction loan for the Project, Exhibit No. 5 at SS038860 - SS038862. Pursuant to the Project Schedule set forth in Ex. No. 2 to the Contract, Stonestreet was required to obtain a final Certificate of Occupancy ("COO") by November 25, 2008. Ex. 1 at SS038849.

The Guaranteed Maximum Price ("GMP") was defined in § 5.2.1 of

the A121 as the sum of (1) the "Cost of the Work" and (2) the "Construction Manager's Fee." The Contract specified that the GMP "was not to exceed the amount provided in Exhibit No. 1, subject to additions and deductions by changes in the Work as provided in the Construction Documents." Exhibit 1 states as the "Final GMP, Dated October 3, 2007, Modified October 25, 2007: $11,250,000." Included in this amount were six items marked "Owner's Budget," which reflected costs associated with winter conditions, roofing, doors, painting, fire protection, and HVAC. Note 1 to Exhibit No. 1 provided that "[i]tems marked owner's budget will be allowances and any cost savings will go directly back to the owner and the GMP will be reduced. No reduction of fee or general conditions will be required if owner items are lowered in costs." Ex. 1, SS038840. A lump sum of $809,888 was included in the GMP as "General Conditions[3]," id. at SS038840.

The GMP was subject to adjustments by "Change Order Requests" ("CORs"), pursuant to which Stonestreet could seek additional funds in the event the cost and/or time requirements of the Project changed. Generally, such CORs were prepared by Stonestreet and then presented to Weybosset for approval. The CORs were reviewed and, if agreed to, approved and signed on behalf of Weybosset by Ed Landry

---

[3]

As David Patrick ("Patrick"), President of Stonestreet, pointed out at trial, the term "General Conditions" in the Contract had two distinct meanings: (1) it referred to Document A201, attached to the Contract and specifying the obligations of the parties, insofar as they had not been addressed in Document A102, and (2) it referred to an item in the calculation of the Final GMP for costs that were associated with the Project. Trial Transcript ("Tr.")vol. 3, 29:4-7, 29:18-30:12 (Mar. 22, 2012).

("Landry"), a First Bristol employee who served as V.P. of Construction on the Weybosset Project. Ex. 84; Tr. vol. 7, 102:13-20 (Mar. 28, 2012). As a reasonable allowance for overhead and profit, Stonestreet was entitled to an up-charge of 4% for overhead and a 6% fee for CORs greater than $5,000, and 9% for overhead and a 6% fee for CORs less than $5,000. A121, § 5.3.3, Ex. 1 SS038797.

In addition, as set forth in § 5.1.1 of the A121, Weybosset agreed to pay Stonestreet for the work (the "Work") described therein "the Contract Sum consisting of the Cost of the Work as defined in Article 6 and the Construction Manager's Fee determined as follows: Lump Sum $430,750." Id. SS038796. The Work was defined as the construction and services required by the Contract Documents and included labor, materials and services to be provided by Stonestreet to fulfill its obligations. Contract § 1.1.3., Ex. 1, SS038813.

Pursuant to Stonestreet's Qualifications and Assumptions, incorporated into the Contract as Exhibit No. 4, all engineering and architectural work was excluded. Ex. 1, SS038853. With respect to the electrical component, although Stonestreet was responsible for distribution, lighting and power, id. at SS038857, "[p]rimary service, cable and transformer [were] not included." Id. at SS038858.

The Qualifications and Assumptions also noted that, although the proposed Project Schedule was for 12 months from commencement of the Work, Stonestreet required "approved building plans which show value[] engineering plans in order to maintain its schedule."

-8-

Article 6 of A 121, titled Cost of the Work for Construction Phase, defined "Cost of Work" in § 6.1.1. as "costs necessarily incurred by the Construction Manager in the proper performance of the Work . . . The Cost of Work shall include only the items set forth in this Article 6." Id. SS038797.  Such costs, which were further described in detail in the respective subsections of Article 6, included: Labor Costs, Subcontract Costs, Costs of Materials and Equipment incorporated in the completed construction, Costs of other Materials and Equipment, Temporary Facilities and Related Items, Miscellaneous Costs, Other Costs, and Emergencies and Repairs. § 6.1.2. - 6.1.8. Id. at SS038797-SS038798. Subcontract Costs were defined in A121 § 6.1.3 as: "[p]ayments made by the Construction Manager to Subcontractors in accordance with the requirements of the subcontracts." Id. at SS038797.

Stonestreet hired subcontractors (the "Subcontractors") for the performance of the Work, using standard subcontracts (the "Subcontracts"), which contained so-called "pay-when-paid" provisions. Every 30 days, Stonestreet submitted requisitions for payments to Weybosset, which included a description of the Work and the progress that had been made. If Weybosset challenged the completion status, the matter would be discussed and, if no agreement was reached, Weybosset would not sign the application.

Progress Payments were to be made according to § 7.1.1 of the A121: "Based upon Applications for Payment submitted to the Owner by the Construction Manager, the Owner shall make progress payments and final payment as provided below and elsewhere in the Contract

Documents." Id. at SS038799. Pursuant to A201 § 9.5.1. , "[t]he Owner may also withhold payment as may be necessary to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 3.3.2, because of . . . failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment. Id. at SS038828.

Initially, work progressed smoothly. By July 2008, overall completion was at 60%, Ex. 110, WH-004010, and by August 31, 2008, drywall was 90% complete and painting had begun. Id. SS8021. According to Patrick, the Project ran into difficulties in the summer when, contrary to Stonestreet's expectations, permanent power was not delivered to the Project. Tr. vol. 1, 127:24-128:11 (Mar. 20, 2012). As Patrick explained in some detail, once the building was fully framed and closed, permanent power was necessary to finish electrical and mechanical components, as well as fire alarms. Id. 128:13-25. Although temporary power was supplied from the existing building to the new structure, the supply was inadequate because most of the power had to be dedicated to the elevators and the heating system, leaving little for lighting the building. Id. 129:15-130:10.

Patrick's involvement in the Project increased during that time to ensure the proper construction of an electrical vault (the "Vault"), which had to be located underneath the sidewalk. Id. 131:10-132:13. In connection with the Vault, Stonestreet generated a Request for Information ("RFI") on July 7, 2008, stating that

-10-

construction of the new sidewalk and concrete masonry unit could not proceed until National Grid had signed off. It also noted that Stonestreet still awaited the mechanicals for the Vault. Ex. 16. According to Patrick, Stonestreet did not receive a response until September 12, 2008. Tr. vol. 1, 135:2-5. Previously, on August 26, 2008, Stonestreet had submitted a COR for adding the construction of the Vault to the Contract. COR 28, Ex. 84, SS20885. Although Weybosset did not sign off on COR 28 until October 9, 2008, Stonestreet continued working on the Vault because it was critical to the Project. Tr. vol. 1, 135:18-135:19.

A Project Schedule, updated on October 27, 2008, reflected an extended COO date of January 28, 2009, based on Stonestreet's new assumption that permanent power would be supplied to the Project by December 1, 2008. Ex. 24. Fire alarm testing and the elevator inspection were assumed to be completed by January 7, 2009, and January 14, 2009, respectively. Id. None of these dates were met because permanent power was not supplied until January 6, 2009.[4]

By December 28, 2008, the GMP had been increased by $568,907 in approved change orders for a total GMP of $11,818,907. Ex. 40 p. 2. At that time, the work on the exterior shell of the building was substantially complete, as was site work at the main entry. However, National Grid had not yet completed the new permanent electrical service for the building. Id. at 3. According to the

---

[4]

It appears that, although permanent power was delivered on December 29, 2008, there were problems with National Grid's installation, causing a further delay until January 6, 2009. Ex. 46.

December 2008 construction report prepared by Robert H. Douglas ("Douglas"), the advisor to Weybosset's construction lender, the new delay in implementing permanent power was attributable to a major winter storm which required National Grid service and repair crews to work on power restoration in the area. Id. A letter dated December 29, 2008 from the Project architect, Newport Collaborative (the "Architect"), opined that a temporary COO could be issued for the purpose of training hotel personnel in the building. Ex. 41, SS011243. An enclosed Completion Schedule prepared by Stonestreet reflected that, although exterior work was finished, other activities still needed to be completed, particularly on the mezzanine, first floor, basement, and stairs. Id. at SS011244-SS011247.

Stonestreet sought to extend its Contract time based on change orders that extended the COO date and in light of the delay in supplying primary power to the Project. Tr. vol. 1, 150:1-5. On December 4, 2008, Stonestreet generated COR 127, which estimated an extension of the Project completion date to January 23, 2009 and a resulting increase in the cost of General Conditions by $138,612. Ex. 38. COR 127 also listed those CORs that had previously requested time extensions and that were, with the exception of COR 126, signed by Ed Landry. Ex. 84.

Although Weybosset did not respond to COR 127, according to Patrick, Weybosset did not advise Stonestreet that Stonestreet would not get paid. In an attempt to resolve the matter, the parties met and, according to Stonestreet, it was agreed that

Stonestreet would receive half of the General Conditions for December 2008 and that COR 127, together with backup information, would be submitted to the Architect for review, as provided for in Article 4 of the Contract.  Tr. vol. 1, 155:10-156:10.

After primary power had been delivered on January 6, 2009, Stonestreet continued finishing work on the Project. A January 7, 2009 e-mail from Patrick to Landry and James Karam ("Karam"), part-owner and manager of the hotel, informed Weybosset that Stonestreet was scheduled to complete its work by January 31, 2009, which allowed pre-testing of the fire alarms and City inspections in the first half of February. Patrick projected a final COO for February 13, 2009. Ex. 45.

By letter dated January 13, 2009, Patrick requested a determination from the Architect on Stonestreet's request to extend the time for receipt of a COO until February 13, 2009, based on the late delivery of permanent power.  In response, by letter dated January 29, 2009, Weybosset informed Stonestreet that, under the Contract, the Architect had no authority to decide or act on Stonestreet's request. Ex. 51. Weybosset also requested the most current Project Schedule, a breakdown of the General Conditions claimed in connection with the extension, and copies of Subcontractor documents so it could review Stonestreet's request. Id.

On February 9, 2009, Stonestreet submitted its January pay application for $205,974. Ex. 58. The application was not paid by Weybosset. Work continued on the Project, where difficulties were

-13-

encountered in connection with the fire alarm system. Weybosset complained about the lack of manpower on the job, in response to which Patrick pointed out that no clear instructions had been received by Stonestreet for the fire alarm system. Ex. 53. Patrick also noted that a COR remained outstanding and needed to be signed "with a time extension," before any work on the system would be continued. Id. at WH-001505 - WH-001506.

A report issued by Douglas on February 8, 2009[5] reflected an increase of the GMP to a total of $11,938,990. Ex. 57 p. 2. In the report, Douglas stated that the construction at the hotel was substantially complete and that, "[s]ince the permanent power has been energized at the end of December, the electrical contractor has been proceeding to complete the tie-ins for the new electrical services as well as the completion of the fire alarm service." Id. at 3, WH-002114.

On February 24, 2009, a temporary COO was issued. Ex. 68. On February 27, 2009, the Department of Inspection and Standards certified the Property as substantially complete as of December 30, 2008. A Certificate of Occupancy ("COO") was issued on March 20, 2009. Ex. 71.

On March 17, 2009, Stonestreet submitted pay application No. 16 for the sum of $1,110,550, together with a printout from its Timberline cost accounting software, detailing the scheduled and revised scheduled value of a particular type of work, as well as

---

[5] The date is erroneously stated as February 8, 2008.

amounts paid and those still outstanding. Ex. 68. The application was not paid by Weybosset. Tr. vol. 2, 42:1-3 (Mar. 22, 2012). On March 30, 2009 Stonestreet submitted a request for additional extended General Conditions for the Project. Ex. 73. The updated version of COR 127 requested a time increase of three months beyond the November 25, 2008 date. Id. at SS0078212. An attached Executive Summary detailed how the late delivery of permanent power and difficulties with obtaining a final design for the fire alarms contributed to the delay in issuance of the final COO. Id. at SS0078216 - SS0078219. Stonestreet also enclosed copies of CORs which requested various time extensions and which were all signed by Landry as approved: COR 8 (2 days); COR 12 (12 working days); COR 13 (4 working days); COR 14 (credit of 2 days); and COR 84 ("project substantial completion delayed to 2/24/09"). Ex. 84.

Around that time, a number of Subcontractors placed liens on the Property because they had not been paid by Stonestreet. Pursuant to Article 11 in the standard form Subcontracts used by Stonestreet, although Stonestreet agreed to "make progress payments on account of the [Sub]Contract Price," Article 11 also included the following pay-when-paid clause: "It is agreed that the Contractor [Stonestreet], as a condition precedent to payment of any monies which become due to the Subcontractor, must first receive payment from the Owner." Art. 11.1, Ex. 1001 SS014369. Although Article 6 of the Contract between Weybosset and Stonestreet included "Subcontractor Costs" under the Heading "Costs to be Reimbursed," there is no explicit requirement in the Contract

that Stonestreet first pay its Subcontractors before it receives a "reimbursement" payment from Weybosset. Rather, Stonestreet was required to "promptly pay each Subcontractor, upon receipt of payment from [Weybosset], out of the amount paid to [Stonestreet] on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled." Contract § 9.6.2. As this Court previously determined, Stonestreet was not entitled to be "reimbursed" for any Subcontractor costs which had been paid directly to the Subcontractors by Weybosset. See Docket Entry 02/28/12.

In general, the "pay-when-paid" clause in the various Subcontracts was not entirely compatible with the payment schedule under the Contract, which was based on overall progress of the Project. If a payment application or COR was denied by Weybosset, Stonestreet, rather than pay its Subcontractors out-of-pocket without knowing whether or when it would be properly reimbursed, did not pay its Subcontractors, relying on the "pay-when-paid" provision in the Subcontract. As a result, Subcontractors were not not getting paid after their work was completed. Tr. vol. 2, 53:15-54:2, Ex. 80.  In May 2009, Stonestreet contacted Weybosset and demanded direct payment from Weybosset so it could pay the Subcontractors. Ex. 80. Stonestreet also alluded to claims of tortious interference by Weybosset with Stonestreet's Subcontracts. Id.  Weybosset, however, made no further payments to Stonestreet and, faced with liens filed by the Subcontractors, paid them directly, but at a substantially discounted rate.

-16-

By the summer of 2009, communications between the parties had completely broken down and, after several attempts at mediation were unsuccessful, the instant litigation was initiated by Allstate, one of Stonestreet's Subcontractors. As noted, although Allstate's claims were satisfied in full early on in this litigation, Stonestreet maintained its counterclaim against Allstate and then raised its own breach of contract claim against Weybosset in this forum.

### III. Stonestreet's Breach of Contract Claim

### A. Adjustments to the GMP

In calculating the extent of its damages claim, Stonestreet first listed all approved CORs that resulted in reductions and increases in the GMP. The original GMP for the Project was set at $11,250,000. Ex. 1 SS38840. The GMP was reduced by $91,076 in allowance adjustments for items such as site work, landscaping, and doors, which were completed for less than what was estimated in the allowance. Ex. 107. For example, the largest item in this category was the allowance for doors, which was estimated at $284,714. The actual cost of those doors per Subcontract with Horner was $234,500, resulting in a credit to Weybosset and a corresponding reduction in the GMP of $50,214. The change in the door allowance, documented in COR 99 was, like every change in this category, approved by Landry. Ex. 84 (comprising copies of all signed CORs in sequential numerical order).

Similarly, Stonestreet assigned a credit to Weybosset for Scope of Work items, which further reduced the GMP by $60,687. Ex.

-17-

107. The largest item in this category related to the cost of sheeting. COR 6, Ex. 84. Sheeting costs had been estimated at $55,011, but, as the sheeting had apparently not been required as anticipated, the actual cost was $8,457.98, resulting in a credit to Weybosset in the amount of $41,053.02 and a corresponding reduction in the GMP. All changes in this category were based on approved and signed CORs. Ex. 84.

### B.   Approved CORs

The next category on which Stonestreet's damages claim is based includes a large number of approved CORs, each reflecting an increase in the cost of Scope of Work, totaling $990,239. Ex. 107. The largest of these items relates to the construction of the electrical Vault. Ex. 84, WH-020885. The category also includes a credit to Weybosset for $36,000 that accounts for a partial payment of the General Conditions which Weybosset agreed to pay to Stonestreet in December 2008. Accordingly, COR 127, issued on December 4, 2008, reflects that the total amount requested by Stonestreet for General Conditions beyond the completion date of November 25, 2008 was reduced by $36,000 "previously approved in req. #4[6]." Ex. 96.

In support of its claim for approved increases, Stonestreet presented 162 CORs that, with the exception of COR 127, were signed by and approved by Ed Landry in his capacity as V.P. of

---

[6]
The reference in Exhibit 96 to Requisition #4 appears to be a typographical error; the reference should have been to Requisition #14.

Construction on the Weybosset Project. At trial, Landry identified himself as the "Owner's representative." Tr. vol. 7, 102:17-20, 104:20-22. Landry took some issue with the COR approval process by pointing out that some CORs were included in requisitions (where, he alleged, they did not belong). He also noted that there were only a few CORs prior to October 2008, but that they then became more frequent, resulting in changes to the requisitions, Tr. vol. 7, 157:24-158:6. However, the undisputed fact remains that these CORs were signed by Landry on Weybosset's behalf. Based on the approval of those CORs, Stonestreet was entitled to payment of, and the GMP was increased by, $990,239 for work reflected by the approved CORs. Ex. 107 at 5. The resulting revised approved GMP, when reduced by a total credit of $151,763 ($91,076 in Allowance Adjustments + $60,687 in Scope Credits) and increased by approved CORs totaling $990,239, was $12,088,476 ($11,250,000 - $151,763 + $990,239).

### C.  Allowance Changes

Stonestreet also seeks $38,241 in "Allowance Changes" that were not approved by Landry or anyone else on behalf of Weybosset. In that category, the largest item is actually a credit to Weybosset for final adjustment for "Winter Conditions." According to Stonestreet's Timberline Cost System, of the $50,000 allowed for Winter Conditions, only $18,947 had been spent by completion of the Project, see Ex. 89, SS101330, and a credit of $31,053 was due Weybosset. It is unclear why the credit for Winter Conditions was not claimed by Weybosset. As Patrick explained, Winter Conditions

constituted an allowance item that was not included in the lump sum for General Conditions. Tr. vol. 2, 174:6-16, Ex. 1 SS038840. At trial, Landry testified that there was "no reason why it should be pending other than I didn't have proper documentation to show what was paid." Tr. vol. 9, 60:4-14 (Apr. 2, 2012). In light of Stonestreet's contention that the Winter Conditions Allowance constitutes a credit to Weybosset, and no suggestion by Weybosset to the contrary, the GMP is subject to a $31,053 adjustment in Weybosset's favor. See Note 1 to Exhibit No. 1 to Contract, Ex. 1 at SS038840.

Stonestreet claims four other Allowance Changes:

(1) $29,417 for Roofing, set forth in COR 62D, Ex. 87, that was not approved by Weybosset. Specifically, Stonestreet alleged that the actual cost of $201,685 exceeded the Roofing Allowance of $175,000, resulting in additional costs of $26,685, on which Stonestreet tacked 4% in overhead costs and a 6% fee, for a total of $29,417. Ex. 87, Ex. 1033.

(2) $13,557 for Doors, set forth in COR 99A, ex. 88. From the base Contract Allowance of $284,714, a credit of $50,214 was applied, resulting in an approved Allowance of $234,500 per COR 99, Ex. 84 at SS035753. The actual cost of the doors was $246,798 leaving an overage of $12,298, to which Stonestreet applied 4% overhead costs and a 6% fee for a total of $13,557.[7]

---

[7]

The Court notes that, with respect to the CORs in this category, instead of applying a flat 10% or 15% adjustment for overhead and fees as it generally did, Stonestreet first calculated 4% overhead, added it to the cost of the work, and then applied a

(3) $22,804.25 for Painting, as reflected by COR 100C. Weybosset's Painting Allowance was initially set at $250,000, but it was subsequently reduced by two approved adjustments in COR 100 and COR 100A, respectively, Ex. 84 at SS035787, SS035766, resulting in a reduced Allowance of $245,736. Ex. 90 at SS210329. The final cost of painting was $266,422, resulting in an overage of $20,686, plus overhead and fee, for a total of $22,804.25.

(4) $3,515.31 for HVAC Allowance, set forth in COR 102A. The original Allowance of $1,250,000 was increased by $5,500 per approved COR 102 and by a $47,495 credit from the plumbing Subcontractor who asked that the gas piping activity be taken out of his Subcontract and added to that of the HVAC Subcontractor. The resulting Allowance for HVAC work of $1,306,337.50 was exceeded by $3,042.50, to which Stonestreet added 9% overhead (applicable to CORs for less than $5,000) and a 6% fee for a total of $3,515.31.

In connection with Stonestreet's claims for Allowance adjustments which, in the absence of Weybosset's approval, remained pending, Patrick based the total costs of each item on the applicable Subcontracts and the invoicing from the respective Subcontractors compared to the scope of work as reflected by the Timberline reports. Tr. vol. 2, 87:25-88:8. Although it was not established at trial that Stonestreet actually paid the Subcontractors for work that exceeded the Allowance limits, payment

---

further 6% fee adjustment to that amount, resulting in a slightly higher percentage than that set forth in the Contract. However, no objection was raised by Weybosset on that basis.

by Stonestreet to the Subcontractors was not a condition precedent to receiving payment from Weybosset for work performed.  Moreover, even if Weybosset paid Subcontractors directly for work, the cost of which exceeded the specified Allowance, it received a credit for those direct payments, which results in a corresponding downward adjustment of the GMP.

Patrick conceded that the specific Timberline printouts attached to CORs 62D, 99A, and 102A were generated after January 31, 2011, but he maintained that the information supporting Stonestreet's request was previously submitted to Weybosset and no testimony was given to the contrary. Tr. vol. 5, 31:1-33:3 (Mar. 26, 2012).

Regarding COR 62D, the Contract provided for a Roofing Allowance of $175,000, which was incorporated in Weybosset's budget as part of the GMP.  Ex. 1 SS038840. As is apparent from COR 62A and the attached Timberline printout, the contract for roofing work was awarded to John F. Shea ("Shea"). Ex. 87. At some point, changes were approved by Weybosset which resulted in costs exceeding the Roofing Allowance. CORs 62, 62A, 62B, Ex. 84 at SS016370, SS034104, SS017208 - 09, SS017205. Pursuant to COR 62, related to the cost for Shea Roofing and Shea Metal Siding, Weybosset approved an increase of $14,400 for total roofing costs of $189,400 (the $14,400 amount was further enhanced by Stonestreet's overhead costs and fees to a total of $16,610). Ex.

84 at SS016370. COR 62B[8], which reflected the approved roofing cost increase from $175,000 to $189,400, requested and was approved for an additional $17,486.82, with 10% adjustment for Stonestreet's overhead and fees included. Id. at SS07208. Finally, COR 62C reflects a credit of $676.68 to First Bristol for certain repairs that Shea made to the roof. Id. at SS017205. As such, the costs related to roof work, which are documented in approved CORs, actually exceeded the allowance adjustment sought by Stonestreet. As noted before, payment to the appropriate Subcontractor was not a condition to adjusting the allowance and the correctness of Stonestreet's cost analysis was not substantively challenged at trial.

With respect to COR 99A relating to Weybosset's Door Allowance, Stonestreet sought an upward adjustment of $13,053. The Door Allowance, set forth in Exhibit No. 1 to the Contract, was budgeted at $284,714. Pursuant to COR 99, approved by Landry, a credit was due Weybosset by Subcontractor Horner in the amount of $50,214. Ex. 84 at SS035753. The actual costs for the doors, based on invoices submitted by Horner and Madaio Glass, Inc., totaled $246,798, for a difference of $13,557.31, including overhead and fee. Again, it is noted that there was no evidence that Stonestreet actually paid for this work. Moreover, Horner and Madaio, like

---

[8]
COR 62A is an approved request for $7,789 for paintwork by Colorscapes for "painting the existing standing seam siding to remain at roof." Id. at SS034104. It is unclear whether this cost is part of Weybosset's Roof or Painting allowance as it is apparently included in the Timberline report supporting COR 87.

Shea, belong to the group of Subcontractors that were paid by Weybosset directly for some of their work (although not necessarily the work reflected in COR 99A). Nevertheless, the actual cost of the doors was not challenged by Weybosset at trial and, if the cost was included in the direct payments Weybosset made to Subcontractors, then, as determined on summary judgment, such payments resulted in a credit to Weybosset and a reduction of the GMP. In other words, there is no reason to reduce the GMP twice for the same costs, once by giving credit to Weybosset for amounts paid, and, secondly, by denying Stonestreet's request to amend the Allowance by costs that, as supported by Subcontractor's invoices, exceeded the contractual Allowance amounts.

Finally, with respect to COR 102A, related to Weybosset's HVAC Allowance, Stonestreet seeks $3,515 in additional costs. Pursuant to the Contract, the HVAC Allowance was set at $1,250,000. Ex. 1, SS038840. COR 102, approved by Landry, reflects that, although the Air Masters HVAC Subcontract was for $1,291,000, a credit of $36,000 was given, resulting in costs exceeding the Allowance by only $5,000, to which Stonestreet applied a 10% surcharge. Subsequently, a Gas Piping Adjustment for $47,795 was taken out of Weybosset's plumbing Allowance and added to the HVAC Allowance, adjusting the Allowance upward to a total of $1,303,295. Ex. 91 at SS014192. Consequently, the $5,500 cost overrun was reduced to $3,042, to which 9% overhead (for changes below the $5,000 threshold) and Stonestreet's 6% fee was added, for a total of

$3,515. COR 102A, Ex. 91.[9]

In sum, Stonestreet presented convincing evidence at trial that the cost of certain work exceeded the respective Allowances set forth in the Contract. Although Weybosset took issue with Stonestreet's timing regarding the preparation of those CORs and the supporting materials, it did not present evidence demonstrating that Stonestreet's calculations were wrong or unfounded. As Stonestreet conceded, almost half of these Allowance Changes resulted in a credit to Weybosset. Based on the testimony of Patrick and the evidence presented in connection with this issue, the Court finds that the requested Allowance Changes of $38,241 are appropriate and that the GMP was increased thereby.

D.   **Pending Scope Increases**

Stonestreet's next category of claims include Scope Increases for a total of $535,677, the most significant of which is asserted in COR 127 for extended General Conditions of $482,119. The remainder of Stonestreet's claim is set forth in fourteen CORs of varying amounts, eight of which are for amounts of less than $5,000, and half of those ranging from $320 to $598. Because cases like this $12 million construction dispute - which usually proceed to arbitration - tend to test the limits of a trial court's

---

[9]

To be sure, it appears that, by recalculating the $5,500 cost overage for Air Masters based on the increased Allowance, Stonestreet is applying its overhead and fees for a second time to the same amount. However, other than establishing that the backup information attached to COR 102A, as submitted at trial, was not given to Weybosset in that form previously, there was no challenge by Weybosset on those grounds, or to the correctness of Stonestreet's cost analysis. Tr. vol. 5, 31:1-33:3.

resources, the Court will only discuss those claims that involve at least $1,500.

COR 23 relates to cost of parking. Stonestreet alleges that it incurred $6,435 in parking costs because, although Stonestreet assumed it would have total control of the tight construction site, Stonestreet was charged for parking its vehicles on adjacent property. COR 23 is supported by bills from MetroPark Limited. Ex. 92, SS038899. At trial, Patrick explained that the basis for COR 23 was that Stonestreet was charged for parking in an area that it was "led to believe" belonged to the Project site. Tr. vol. 2, 91:12-19 (Mar. 21, 2012). Meeting Minutes from February 7, 2008 reflect that "Jeff[10] is currently working on the change order for the parking charges. Stonestreet is being charged for the land that is part of the project area." Ex. 7, SS011479. Chris Reynolds ("Reynolds"), former Stonestreet V.P. of Operations, testified at trial that, because the Project site was tight, he wanted to make sure he controlled the entire site. Tr. vol. 5, 109:1-6. He further explained that there was a ten foot area behind the building that was part of the site, but that it had already been leased out. Id. at 109:7-12. Reynolds advised (Jeff) Karam that he would put in a change order and Jeff advised him to "go talk to Metropark and see if we can get that resolved." Id. 109:13-22.

Landry's response on why COR 23 was disallowed varied at trial. He first suggested that he received insufficient backup

_____

[10]

Based on the list of attendees, this appears to refer to Jeff Karam on behalf of Part Owner First Bristol Corporation.

information, see Tr. vol. 8, 132:13-16 (Mar. 29, 2012), and then stated that there was not enough space at the back of the building within the property line to park cars, id. at 132:17-21, that the information was presented very late in the Project, id. at 133:2-7, and that parking for Stonestreet workers was not under the Contract, id. at 134:13-135:6.

From the evidence submitted at trial, including Reynold's unchallenged testimony and the C-4 Site Plan of the Project, it appears that Stonestreet expected to use the area behind the building for parking, only to find out that the area had already been leased. Reynold's communication with Jeff also indicated that Weybosset was made aware of this issue early in the Project and did not outright reject Stonestreet's claim for parking reimbursement. Therefore, the Court finds that the cost of parking is included in the "Scope Change."

COR 57E was submitted in connection with the patching of holes in the hoistway and around hall buttons by Otis Elevator Company ("Otis") for an amount of $2,794, described as additional costs to COR 57A and including a 15% markup (as customary for CORs requesting less than $5,000). Ex. 93 SS034062. CORs 57, 57A, 57B, 57C, and 57D all related to work for the elevators; all were approved. Ex. 84, SS034065, SS034069, SS034072, SS034085. Pursuant to approved COR 57A, Ex. 84 SS034069, $1,760, including 10% markup, were requested for Tom Fernandes to brick and mortar in new control panels. COR 57E is supported by a bill from Otis for $2,430, id. at SS034063, and a Certificate of Time for 18 hours of work, id. at

SS034064. As Patrick explained at trial, the additional charge from Otis was for operating the elevator car when it was used as a work platform. Tr. vol. 2, 92:7-17. Landry acknowledged that the charge was "for hours that Otis wanted to be able to adjust the cabs so that workers could do some work for them in their shaft," but he maintained that he "disallowed it because that was unreasonable." Tr. vol. 8, 135:22-25. Landry also stated that "a quarter-of-a-million-dollar contract was given to [Otis]", and he suggested that such charges are always negotiated with the elevator company. Id. at 136:1-6. Landry did not dispute, however, that the necessary work had been done and that the charges were assessed by Otis against Stonestreet. Given the evidence and Patrick's explanation related to this charge, and in the absence of any explanation for the disapproval other than Landry's assertion that the charge was "unreasonable," the Court finds that COR 57E should have been allowed.

COR 79 relates to floor changes in the exercise room, for which Stonestreet sought additional costs of $6,538, which included 6% overhead and a 4% fee. Ex. 94. As explained by Patrick at trial, the floor changes in the exercise room were outside of Stonestreet's Scope of Work. Tr. vol. 2, 95:9-12. Stonestreet's Scope of Work provided for a particular floor structure, which was subsequently changed, resulting in additional cost to supply that floor. Id. at 93:20-94:4. According to Patrick, the floor was one of the items contained in the Qualifications and Assumptions to the Contract and, therefore, no Owner approval was required. Tr. vol.

5, 34:19-35:11.   The floor was to be wood-framed, but it was subsequently discovered that this would require a sprinkler system and, in the spirit of value engineering, it was decided to fill the area with concrete. Id.

Although Landry initially suggested that no one had ever submitted COR 79 to him, Tr. vol. 8, 136:18-137:8, his recollection of the work involved is consistent with Patrick's testimony. The floor in the former boiler room had a four foot depressed area and the space was initially intended to include a spa. Tr. vol. 9, 54:6-20 (Apr.2, 2012). Landry recalled that he gave Reynolds "the latitude to do whatever he wanted to fill the floor before and after the idea of the spa." Id. at 54:9-12.

Stonestreet's Qualifications and Assumptions stated that "[t]he spa scope of work has been eliminated. There is no excavation, backfilling or utility trenching in the basement." Ex. 1 SS038853. Further, the "[s]cope of work in the basement includes a wood framed floor to fill in the lower elevation where the existing boilers are." Id. at SS038855 (emphasis added).

Given this evidence and testimony, it is apparent that a change in the flooring, which resulted in higher costs to Stonestreet, was outside of Stonestreet's Scope of Work and that COR 79 should have been allowed by Weybosset.

COR 122 for $4,025, including overhead and fees, is for the installation of synthetic stucco over concrete at the archway wall and piers. Ex. 95. According to the COR, the GMP specified cast stone details at the archway wall and synthetic stucco at the

piers, which was first changed in 12/17/07 drawings that added additional precast and, then again, in 01/18/08 drawings which provided a change from cast stone to synthetic stucco. Ex. 95, SS21034. The backup to COR 122 included a letter dated December 8, 2008 from Stonestreet Project Manager Chris Manlove ("Manlove") to Landry, id. at SS21341, explaining the changes from the GMP drawings, a bill from Dexter for a portion of the work, id. at SS210342, additional e-mail correspondence from and to Manlove, id. at SS210343, a "Change Estimate" from Jesmac, Inc. ("Jesmac") for $3,651, id. at SS210344, a section of Exterior Details Drawing A8.3 dated December 10, 2007, id. at SS021345, and a page from Stonestreet's Timberline system generated in January 2011, showing a line item for Jesmac's invoice, id. at SS210346.

At trial, Patrick stated that the actual cost was the same as previously estimated by Jesmac and that he witnessed the work being performed by the Subcontractor. Tr. vol. 2, 98:1-9. Landry, while acknowledging that the original drawings featured a lot of brick in the portico area, which was later reduced to a quantity of EIFS [exterior insulating finishing system, also called synthetic stucco], maintained that he and Reynolds agreed that this would not be paid by First Bristol and that he marked COR 122 void on his log "for the entire duration of the job." Tr. vol. 8, 138:1-13. The Weybosset COR log dated February 13, 2009, marked COR 122 as "submitted," whereas the Weybosset COR log dated August 17, 2009, marked the same COR as "void." Given the detailed and undisputed backup information supporting COR 122, and in the absence of any

-30-

concrete evidence that Stonestreet agreed to pay for changes from the original GMP Drawings, the Court finds that COR 122 should have been allowed.

COR 139 was a request of additional payment (or increase of the GMP) for $11,985, including overhead and fee. Ex. 97. This COR related to repair work and repainting after a number of bathroom doors were hung incorrectly. As Patrick explained in his testimony, hollow metal doors were purchased and installed according to provided plans; however, in December 2008, it was determined that the installed frames needed to be reversed in order to have the doors swing away from the bathroom vanity. Tr. vol. 2, 108:16-20. Backup information to COR 139 included a change proposal from Colorscapes, LLC, for $9,071, and a change order from Horner for $2,327 (it is unclear whether that amount was subsequently reduced to $1,800 assessed in COR 139). According to Patrick, the work was performed and the backup information was provided, but Weybosset declined to approve COR 130. Tr. vol. 2, 109:4-110:1.

As Landry conceded at trial, Stonestreet hung the doors in accordance with drawings provided to them as part of the Contract, specifically Architectural Drawing A1.2, showing the Third and Fourth Floor Plans. Ex. 3, SS202021. Tr. vol. 9, 58:7-24. Landry maintained that those were not "the only drawings they're supposed to refer to," id. at 58:25-59:1, although it was not established at trial to which other specific drawings he was referring.

Given the evidence of the error in the architectural drawings, together with Patrick's testimony and the backup information

provided in support of COR 139, the Court finds that COR 139 should have been allowed.

COR 191 related to the installation of additional parts to connect the pressurization panel to the fire alarm panel; it requests an additional amount of $5,638, 10% markup included. According to the request, the additional materials were not specified in the parts list from the panel manufacturer. Ex. 103, SS210380. The COR is supported by a bill from Power Service Inc. and an estimate for materials and journeyman hours. Id. at SS210381, SS210382. Patrick's testimony at trial that the parts were supplied and that COR 191 was submitted to Weybosset in April of 2009 was undisputed; hence there was no evidence to support Weybosset's rejection of COR 191 and the Court finds that the COR should have been allowed.

COR 200 was a request for $7,469 related to an adjustment of the Elevator Allowance. Ex. 105, SS210387. As set forth in COR 200 and in the attached copy of the GMP, the GMP Budget specified $192,914 for elevators. Id. at SS210387. However, this included $13,959 for a linen chute that was specifically excluded in Stonestreet's Qualifications and Assumptions. Id. at SS210388-89. The subtraction of the linen chute cost reduced the elevator budget to $178,955; however, the final cost of the elevator was $186,423. Stonestreet did not add the customary charge for overhead and fee to its request because it had previously agreed to do the elevator work without an additional fee. Tr. vol. 2, 121:10-16. Included in the backup information for COR 200 was Stonestreet's estimate for

the cost of the elevator work. Ex. 105 at SS210389. When asked on cross examination why he provided this estimate in the backup to COR 200, Patrick explained that, in Stonestreet's cost reports, Division 14 (related to elevator work) had been "lumped together," and that he intended to differentiate the cost between the elevator renovation and the linen chutes. Tr. Vol. V, 38:19-39:25.

Because Patrick's testimony and the evidence supporting Stonestreet's claim under COR 200 was materially unchallenged, the Court finds that COR 200 should have been allowed by Weybosset.

COR 503 requested $4,137 for overhead and fees for job clean-up costs, which was generated on February 9, 2009 and submitted to Landry on April 23, 2009. Ex. 106. According to the description of COR 503, out-of-sequence cleaning was necessary "as the result of the delay in the project receiving permanent power. At the Owner's request, guestrooms were cleaned out of sequence repeatedly." Ex. 106, SS210394. COR 503 specified that the cost of cleaning performed in November and December 2008 totaled $40,397 ($15,950 + $20,047 + $4,400) and that Stonestreet sought 4% for overhead and 6% for its fee for a total of $4,137. The supporting backup information included a second copy of COR 503 with a handwritten notation of the requested amount and a page from Stonestreet's Timberline system generated in March 2011, reflecting three separate invoices from Suburban Contract Cleaning. At trial, Patrick explained that additional cleaning was needed because the Project was built out of sequence. Tr. vol. 2, 122:8-10. Although, initially, Stonestreet sought the entire amount of the clean-up

costs, the COR was modified because Weybosset paid the Subcontractor directly. Id. at 122:10-15. On cross examination, Patrick confirmed that Stonestreet only sought to be paid for overhead and profit and that a credit had been given to Weybosset for any payment it made to Suburban. Id. at 160:11-161:3. Patrick acknowledged that the actual cost of cleaning - on which COR 503 was based - was included in the calculation of Stonestreet's COR 127 for extended General Conditions, Ex. 96, and that Weybosset was not actually given a credit; rather that Stonestreet did not intend to charge Weybosset twice for the same costs. Tr. vol. 2 at 162:16-163:16. Nevertheless, the backup information established that Suburban charged the amounts in question for additional cleaning and no evidence or testimony was submitted that indicated Weybosset disagreed with the amounts, the work performed, or Stonestreet's entitlement to its percentage. In other words, as Patrick testified, Stonestreet sought only its contractual overhead and cost. In the absence of any evidence that the charges were incorrect or not applicable, or that Stonestreet's request for overhead and fees was unwarranted, the Court finds that COR 503 should have been allowed.

### E.   Extended General Conditions

As already noted, Stonestreet's most significant claim with respect to "Scope of Work" increases was asserted in COR 127, which sought payment of $482,119 for extended General Conditions. Ex. 96. Section 8.3.1 of the Contract provides:

> If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect

of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending mediation and arbitration, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Owner may determine. Ex. 1 SS038827.

In support of its claim, Stonestreet maintained that the delays on the Project were caused by Weybosset, primarily by Weybosset's inability to provide primary power. Stonestreet's expert, Bradford L. Bright ("Bright"), agreed with Stonestreet's conclusion and, in support of its claim, Stonestreet introduced a number of CORs at trial in which it had requested (and Weybosset had approved) time extensions in connection with certain tasks on the Project.

Pursuant to the Contract, which specified November 25, 2008 as the projected completion date of the Project, the GMP included a lump sum of $809,888 in Stonestreet's budget for General Conditions. Ex. 1 at SS038840. In December 2008, Stonestreet submitted COR 127, requesting a General Conditions increase of $138,612 for Project Schedule delays. Ex. 38. This version of COR 127 referred to a number of CORs which reflected an anticipated completion date of January 23, 2009.[11] The CORs listed in COR 127 (CORs 8, 12, 13, 14, 38, 38A, 38B, 38C, 38E, and 138) are set forth in Ex. 84. They all requested time extensions for a variety of

---

[11] Ex. 28 reads the date as January 23, 2008; however, it was acknowledged at trial that this was a typographical error.

reasons and were signed by Landry. (As previously noted, COR 126, for schedule delays related to permanent power, was not signed by Landry).

At trial, Patrick explained that, although, up to COR 126, all other CORs had been approved, Weybosset did not respond to COR 127 at all. However, Weybosset never indicated that Stonestreet would not be paid for extended General Conditions, and Stonestreet kept working on the Project. Tr. vol. 1, 154:10-155:1. According to Patrick, following a discussion between the parties - in which Stonestreet threatened to shut down the job if it did not get paid - an agreement was reached that Weybosset would pay half of the General Conditions for December ($36,000) and that the COR with backup information would be submitted to the Architect for review pursuant to Section 4 of the Contract. Id. at 155:21-156:10.

In its posttrial memorandum, Weybosset claimed that Stonestreet was not entitled to $111,306 for extended General Conditions through December 31, 2008 because "Stonestreet was paid and accepted $36,000 for extended general conditions for that period and released and waived any further claims against Weybosset." In support of this contention, Weybosset offers a "Release, Waiver of Lien Material, Equipment and Labor," (the "Release") pursuant to which Stonestreet purportedly waived any and all contract damages claims against Weybosset. Weybosset Mem. 36 (Docket # 180), Ex. 1158.

At trial, Patrick acknowledged that Stonestreet provided releases to Weybosset and that the Release, executed at an

-36-

unspecified date in 2009, was likely issued for payment on Requisition # 14 for Stonestreet's receipt of Check # 09524 for $553,091. Tr. vol. 4, 92:22-95:5 (Mar. 23, 2012).[12] Requisition #14 for the period ending December 31, 2008, reflects a current amount due of $553,091. Ex. 110 at SS0087968. The requisition also includes $36,000 for extended General Conditions, noted as pending in COR 127. Id. at SS0087979. Patrick testified at trial that, although Requisition #14 was paid in full by Weybosset, the requisition included "the discounted amount of general conditions that we agreed to take in order to stay on and keep the job going with an understanding that our general conditions delay claim would be presented to the architect as the independent third-party reviewer per the contract." Tr. vol. 4, 99:11-21.  On its part, Weybosset now suggests that "Stonestreet's subsequent acceptance of Weybosset's payment on the December application and its execution and delivery of the release plainly waived, obviated and rendered immaterial any claim or complaint by Stonestreet in connection with the alleged oral understanding and dispute over meeting with the architect." Weybosset Mem. at 37 (Docket # 180).

It is undisputed that General Conditions were calculated at approximately $72,000 per month.  Likewise, Weybosset does not directly dispute that the parties came to an oral agreement at a meeting on this issue that Stonestreet would be paid half of the requested amount for December 2008 and that the parties' dispute

---

[12]
No other testimony regarding the Release, Ex. 1058, was offered at trial.

regarding extended General Conditions would be submitted to the Architect. Stonestreet followed up with the Architect but, as the Architect testified at trial and as Karam confirmed in his own testimony, Weybosset instructed the Architect not to make such a determination.

Karam acknowledged at trial that a conversation with Patrick had taken place, in which Patrick threatened to walk off the job and asked for extended General Conditions. Tr. vol. 9, 143:15-25. According to Karam, he agreed to pay $36,000, which was intended to cover extended General Conditions through the end of January (a position that Weybosset does not appear to assert in its memorandum, which refers to extended General Conditions through December 31, 2008). Tr. vol. 9, 144:12-16, 145:2-8. At first, Karam flatly denied that there were any further agreements that Weybosset had with Stonestreet with respect to payment of extended General Conditions, id. at 145:5-12. However, he later conceded on cross-examination that Weybosset had indeed instructed the Architect not to address Stonestreet's request for determination of its claim for extended General Conditions. Id. at 152:10-153:8.

Evidence submitted at trial also showed that Karam initially received a #14 "pencil requisition" for $588,673, which reflected a request for  extended General Conditions of $152,473 per COR 127. Ex. 128 at SS0081164. Subsequently, Requisition #14 was changed, reducing extended General Conditions to $36,000 per the agreement between Weybosset and Stonestreet.

By letter dated January 13, 2009, Patrick requested a

-38-

determination by the Architect regarding Stonestreet's request for "extending the time for receipt of a final certificate of occupancy until February 13, 2009 due to the Owner's late delivery of permanent power."  Ex. 46 at 1. In response, Weybosset took the position that the Architect had "<u>no</u> authority to decide or act on the request," Ex. 51 at SS100794 (emphasis in original), because the authority to grant time extension requests rested solely with Weybosset's designated representative. Contract § 3.2, Ex. 1 at SS038796. Stonestreet received no determination on its request. At trial, the Architect for the Project, James Michael Abbott ("Abbott"), testified that Newport Collaborative received the request but did not respond because "we were instructed not to" by Weybosset's counsel. Tr. vol. 4, 17:10-24. Abbott's testimony that he was directed not to respond was confirmed by Karam at trial. Tr. vol. 9, 152:18-153:8.

Based on the evidence submitted at trial and the testimony of Patrick, Abbot, and Karam, the Court draws the conclusion that the Release offered by Weybosset only serves to document that Stonestreet received full payment for Requisition #14, which included a reduced amount of $36,000 in extended General Conditions. As such, it is entirely consistent with Patrick's explanation that the parties negotiated such a reduction with the understanding that the remainder of Stonestreet's request would be submitted to the Architect. Consistent with this agreement, Stonestreet sought the Architect's determination on this issue, but Weybosset reneged on that agreement and forbade the Architect to

-39-

make such a determination. For those reasons, the Court rejects Weybosset's contention that the extended General Conditions through December 31, 2008, should be limited to the $36,000 included in the payment for Requisition #14.[13]

On March 30, 2009, Stonestreet again submitted a version of COR 127, raising the amount for extended General Conditions to $254,809, based on an additional 93 days necessary for the completion of the Project. Ex. 73 at SS0078211-SS0078212. In addition to a 3-page Timberline report, Stonestreet submitted a detailed 4-page Executive Summary, in which it addressed the impact of the late delivery of permanent power on the Project. Id. at SS0078216-SS0078219. Stonestreet also included copies of approved CORs 8, 12, 13, 14, 84, as well as three change orders from Power Service Inc., reflecting charges for work performed in January 2009. Id. at SS0078225-SS0078227.

On April 15, 2009, Stonestreet submitted COR 127A for additional General Conditions of $77,637 for the period between February 25, 2009 and April 15, 2009. Ex. 76. The costs assessed therein relate primarily to project management, dumpsters, and temporary lighting. Id. at SS0077425. At trial, Stonestreet introduced a version of COR 127 which had been revised on March 27,

---

[13]

Stonestreet also sought to support its claim for extended General Conditions with reference to Weybosset's submission of certain materials in connection with the historic tax credit process. Although the Court initially granted the admission of Exhibits 116, 117, 119, 121, and 122, upon review of the testimony and evidence submitted at trial, the Court concludes that those exhibits should have been excluded. They will not, therefore, factor into the Court's analysis of this issue.

2009, and which reflected that Stonestreet had already received $36,000 in payment as previously approved in Requisition # 14. Ex. 96. The final total amount sought by Stonestreet related to General Conditions was $482,119. Patrick explained that the costs reflected in COR 127 included the costs of extending the completion of the Project from November 25, 2008 into March 2009. Tr. vol. 2, 99:6-100:8. Patrick also asserted that some of the costs extended beyond March 2009 because "[w]e just continually worked on the project to try to get it closed out, and these are costs and hours and payroll money that we expended trying to finish the project and get paid." Id. at 100:9-19.

In support of its claims for extended General Conditions and in defense of Weybosset's claim for liquidated damages, both of which related to the delay in the Project, Stonestreet offered the expert testimony of Bradford L. Bright, whose expertise has previously assisted this Court in determining the cause of a construction delay. See ADP Marshall, Inc. v. Noresco, LLC, 710 F. Supp. 2d 197, 216 (D.R.I. Apr. 30, 2010).

In this case, Bright was retained to review the circumstances of the delay on the Project in order to determine whether (1) the delays for which Stonestreet sought time extensions were excusable and compensable, and (2) the liquidated damages sought by Weybosset were reasonable. Tr. vol. 6, 6:11-22 (Mar. 27, 2012). To form his opinion, Bright reviewed the Contract, specifications, drawings, Subcontracts, correspondence, inspection reports, CORs, meeting minutes, schedules, and pay applications. Id. at 6:25-7:10. Bright

-41-

interviewed Patrick and reviewed the deposition testimony of Landry, James Santos, the former owner/operator of electrical Subcontractor Power Service, Inc., and Reynolds. Id. at 7:23-8:3. In order to understand the effect of the delay in the supply of permanent power to the Project, Bright repeatedly visited the hotel to see the areas that remained incomplete because permanent power was delayed. Id. at 8:7-23. He eventually prepared a report and a supplemental report. Id. at 9:4-7.

Bright described the difference between excusable delay (for which the contractor is granted a time extension because the delay is out of his control) and non-excusable delay (for which no time extension is granted because the contractor is responsible for the delay). Id. at 9:8-18. Bright explained that, in order to determine whether an excusable delay is compensable, it must be determined "if that delay is solely caused by the acts of others and that there are no concurrent critical delays caused by the contractor in that same period." Id. at 10:1-5. The methodology used for that determination is the critical path schedule analysis.[14] Id. at

---

[14]

The following definition of "critical path" is offered by the United States Court of Claims:

"Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work.... The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A

10:12-20. A "succinct definition of critical path activities are 'those activities which if allowed to grow will impact the completion date of the project.'" Weaver-Bailey Contractors, Inc. v. United States, 19 Cl.Ct. 474, 480 (1990).

Based on his review of the Project Schedules and related materials, Bright determined that, through the June/July period of 2008, the Project was generally on schedule. Id. at 23:4-8. Through September 2008, those critical path activities that were not affected by permanent power were completed according to the schedule. Id. at 24:12-20. However, activities that could not be started or performed because power was not delivered to the Project in the summer, as anticipated, started to fall behind. Id. at 25:2-9. Bright also considered and evaluated the Project Schedules from October 2008, February 2009 and March 2009, and concluded that "the delay to the design of the vault and the delay to the installation of permanent power began to affect the project in a critical path sense in probably the August, July, August [sic] time frame and continued to affect the project directly up through the point where permanent power was installed on January the 6th." Id. at 33:19-25.

Bright explained that he reviewed a number of Contract provisions to determine which party was responsible for the delay. Id. at 34:9-16. Stonestreet's Qualification and Assumptions specifically excluded primary service, cable and transformers from Stonestreet's Scope of Work. Ex. 1 SS038857. Pursuant to Section

---

delay, or acceleration, of work along the critical path will affect the entire project." Haney v. United States, 230 Ct. Cl. 148, 676 F.2d 584, 595 (1982).

2.2.2, Weybosset was responsible to secure permits and approvals, and any information or services required by Weybosset under the Contract were to be furnished with reasonable promptness under Section 2.2.4. Section 6.1.3 provided that Weybosset was responsible to coordinate its activities and that Stonestreet was required to make changes to the schedule as necessary. Ex. 1 at SS038824. Pursuant to Section 6.2.3, Weybosset was responsible to Stonestreet "for costs incurred by Stonestreet because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor."[15] Id. at SS038825.

Bright explained that, when permanent power was connected to the building on January 6, 2009, it was not fully distributed throughout the building because the temporary power first had to be disconnected and replaced. Tr. vol. 6, 37:17-38:13. Although, at that point, certain series of activities could proceed, their start had been delayed earlier by the lack of permanent power. Id. at 38:17-39:10.

A separate issue contributing to the delay of the Project was the design related to fan pressurization and the smoke control panel. Id. at 40:6-16. There was a change in the smoke control panel design in mid-February 2009 for which a separate "attachment to the existing panel" was ordered by Weybosset and installed in

---

[15]

Correspondingly, Stonestreet was responsible to reimburse Weybosset "for costs incurred by [Weybosset] which are payable to a separate contractor because of delays, improperly timed activities or defective construction of [Stonestreet]." Id. at SS038825.

mid-March 2009. Id. at 40:19-41:10. A test of the pressurization system failed in February 2009, after which Weybosset ordered an additional or larger fan that was connected by Stonestreet in late February 2009. Id. at 41:11-22.

Bright also described, in some detail, why certain work could not immediately be completed even after permanent power became available. The lobby area had been used for storage of large rolls of electrical wire, precluding Stonestreet from doing finish work in that area. Id. at 42:7-15. Likewise, the plumbing Subcontractor held off on certain work because he did not want the work damaged or risk the possibility of theft. Id. at 42:16-19. For finishing work that Stonestreet was scheduled to perform, e.g. millwork, wall coverings, paint and other touch up work, climate and humidity control was necessary, and those tasks were also delayed by the lack of permanent power, Id. at 43:11-44:10.

Bright's ultimate conclusion was that the Project's critical path was delayed by two primary obstacles: (1) until the January 2009 time frame, the lack of permanent power, and (2) following completion of permanent power and into March 2009, the fire protection and life safety system design. Id. at 44:11-45:4. Because Weybosset controlled both of those issues, Bright deemed Weybosset responsible for the critical project delays. Id. at 45:22. The total period of critical path delay was from November 25, 2008, the original COO date, until March 20, 2009, when the COO was finally issued. Id. at 45:23-46:2. Bright also concluded that the delays were excusable because they were outside of

Stonestreet's control and because there were no other concurrent critical delays. Id. at 46:3-16.

Based on requested time extensions that were all approved by Weybosset, Bright prepared a Summary of Change. Ex. 112. Exhibit 112 lists 16 separate CORs which requested time extensions of various lengths (COR 14 actually resulted in a credit to Weybosset of two days). All 16 CORs are set forth in Ex. 84 and all were approved and signed by Landry. Ex. 84 (listing CORs in numerical sequence). Based on the time extensions set forth in the CORs, Bright calculated that Stonestreet was entitled to an additional 79 work days. He converted the days into calendar days because the Project Schedule in the Contract was based on calendar days, as was the liquidated damages provision. Id. at 51:17-52:7. An application of 111 calendar days extended the completion date of the Project from November 25, 2008 to March 16, 2009. Id. at 51:17-21.

To illustrate his conclusion that no concurrent delays affected the Project, Bright generated a 4-page graphic which showed (1) the impact of Stonestreet's approved extension requests on the schedule, (2) the discrepancy between planned and actual schedule dates for critical completion activities, (3) the impact of Owner-controlled activities on the critical path, and (4) a summary of critical and non-critical activities and delays. Ex. 113. With respect to the first graphic, Bright marked some of the CORs as "disputed" and explained at trial that, although those CORs had initially be signed by Weybosset, once litigation began, there was a dispute "whether or not those signed change orders provide

Stonestreet a time extension, whether or not they're valid change orders." Tr. vol. 6, 59:18-60:22. Upon questioning by the Court, Bright explained that, pursuant to standard industry practice, a contractor will request a change when he identifies a problem and the owner can deny the change, accept it, or ask for additional information. Id. at 60:25-61:7. He emphasized that "[t]ypically, when change orders are submitted and signed, it's over and done with." Id. at 61:8-10.

Based on Weybosset's approval of Stonestreet's time extension requests specified in the various signed CORs, the critical delay of provision of permanent power, and the problems with delivery of final designs, Bright concluded that Weybosset was not entitled to an award of liquidated damages from Stonestreet. Id. at 71:2-72:1.

Bright's analysis of why the lack of permanent power caused delays on the Project was well supported by other testimony explaining the challenges of working in a ten-story building with a limited temporary power supply. Patrick described in some detail that, in November and December 2008, when the permanent power supply expected in the summer had not yet been implemented, the work site was cold and presented problems in finishing. Tr. vol. 3, 140:20-141:6. Patrick also explained how lack of a final design of the fire alarm control panel caused a significant delay. Tr. vol. 2, 29:21-30:9. E-mail correspondence between Patrick and Karam from February 2009 supported Stonestreet's position that it had repeatedly pointed out that building the fire alarm system was hampered by lack of final engineering documents. Ex. 62 at

-47-

NCA003476. In the same correspondence, as at trial, Patrick rejected Karam's suggestion that the Project was not moving forward because of lack of manpower. Patrick noted that the Project was 99% completed even before permanent power was implemented and that, at that time, Stonestreet still had to wait for the fire alarm system and stair pressurization.  Tr. vol. 2, 30:16-31:3.

Weybosset's suggestions that Landry had no authority to approve CORs which requested a time extension were essentially unsupported. At trial, Landry stated that he did not know whether he had ever informed anyone at Stonestreet in writing that he had no authority to sign time extensions. Tr. vol. 9, 7-17.

Landry also asserted that he informed Reynolds in the spring of 2009 that he was authorized to review change order requests for costs only and not for time, and that Reynolds "should make an appointment with Karam to review anything in regards to time". Tr. vol. 8, 125:25-126:14. However, Landry's testimony on this point was not confirmed by Reynolds at trial. Reynolds, when asked about a conversation regarding the scope of Landry's authority, explained that "typically he [Landry] went back to Jim on everything, that was, he had to obviously get Jim's blessing before he could sign anything." Tr. vol. 5, 138:2-12 (emphasis added). Moreover, it is undisputed that Landry signed sixteen such requests without ever amending or striking out the time requests on the various CORs. Ex. 84.

Karam suggested at trial that he first became aware in 2009 that Stonestreet had asserted a claim for extended General

-48-

Conditions. Tr. vol. 9, 138:19-139:4. According to Karam, he told Patrick that he denied the request because the delays were caused by Stonestreet and its Subcontractors. Id. at 139:4-9. An e-mail dated January 9, 2009,from Karam to Patrick stated that Weybosset refused to recognize additional General Conditions.  Ex. 1042. However, Karam acknowledged that Weybosset subsequently paid $36,000 in extended General Conditions because Stonestreet threatened to discontinue working on the Project. Id. at 144:12-16. Karam also acknowledged that he was made aware of COR 127 (requesting extended General Conditions) in December 2008, before that amount was paid. Id. at 146:12-22.

In sum, Weybosset's efforts to establish, after the fact, that the CORs approved and signed by Landry were outside of Landry's authority with respect to time extensions, were unconvincing. Stonestreet's claims for extended General Conditions from November 25, 2008 to March 16, 2009 are independently supported by Bright's critical path analysis and by the sixteen CORs listed in Exhibit 112. With respect to costs of General Conditions after the issuance of the COO, Patrick's testimony that he had to employ staff to attempt to close out the Project, pay Subcontractors, reconcile Stonestreet's accounts and obtain final payment on the Contract was not refuted at trial. Moreover, these costs were incurred by Stonestreet, at least in part, because Weybosset had refused to render payment due on CORs which it had previously approved, and on other CORs and Contract Allowances that should have been approved by Weybosset.

-49-

Weybosset also takes particular exception with respect to $65,665 included in Stonestreet's General Conditions for "secretaries and estimators who are stationed at Stonestreet's office," and it suggests that the Contract "expressly prohibits Stonestreet from charging them to Weybosset." Weybosset Mem. at 41. Further, Weybosset contends that the Contract precludes Stonestreet's recovery of $182,956 in charges for personnel, insurance, dumpster, and other costs following the delay period. Id. at 43.

With respect to Weybosset's first contention, it is correct that Subsection 6.2.1 of the Contract generally excludes from the Cost of Work (1) the salaries of Stonestreet's personnel at Stonestreet's principal office, (2) the expenses of that office, and (3) overhead and expenses, all except as specifically provided in Subsections 6.1.2.2 [16], 6.1.2.3., and Section 6.1., respectively. Ex. SS038799. Subsection 6.1.1. includes in the "Cost of Work" costs necessarily incurred by the Construction Manager in the proper performance of the Work.  Subsection 6.1.2.3. includes into the Cost of Work "[w]ages and salaries of the Construction Manager's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work." Ex. 1 at SS038797.

---

[16]

Referenced subsection 6.1.2.2. has been left blank in the Contract. Ex. 1 at SS038797.

It is undisputed that in March 2009, after the final COO had been issued, Stonestreet's field office was moved out. Tr. vol. 3, 8:5-11. However, as explained consistently, repeatedly, and in detail by Patrick at trial, prior to the signing of the Contract, the parties agreed to convert the cost category of "General Conditions" to a "lump sum." Id. at 19:20-20:15, 22:11-12, 24:12-21, 33:1-2. The costs of preconstruction and construction, which included, *inter alia*, secretarial and estimating costs, were "wrapped together" and, as a "lump sum" for "General Conditions," no longer fell under the provisions of the Contract in terms of cost accounting. Id. at 19:20-20:3. As Patrick explained, the change was reflected in Exhibit No. 1 to the Contract, which included, under the rubric "Division 1," General Conditions for a "lump sum" of $809,888[17]. Ex. 1 at SS038840. According to Patrick, because the Project was a GMP type project, it was an "open-book project," in which cost data was made available for what was spent in each category. Tr. vol. 3, 20:4-8. Patrick's testimony, that "prior to signing of the contract, the owner and contractor agreed that general conditions would be lump sum," id. at 20:10-12, was not contradicted at trial.

It is well established Rhode Island law that "parties to a contract can mutually assent to modify a contract if the modification does not violate the law or public policy and if the

---

[17]

Division 1 also included Winter Conditions as a $50,000 Owner's Budget item. As discussed herein, Weybosset is due a partial credit under the Contract for this item.

modification is supported by adequate consideration." <u>Fondedile, S.A. v. C.E. Maguire, Inc.</u>, 610 A.2d 87, 92 (R.I. 1992)(citing <u>Angel v. Murray</u>, 113 R.I. 482, 489, 322 A.2d 630, 634 (1974)). While the modification can be "written, oral, or implied," <u>see Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Systems, Inc.</u>, 539 A.2d 523, 526, the "burden of proving the existence of the modification rests with the party alleging the new contract." <u>Fondedile, S.A. v. C.E. Maguire, Inc.</u>, 610 A.2d at 92 (citing <u>In re Ewing</u>, 39 B.R. 59 (Bkrtcy.D.R.I. 1984)). "To satisfy this burden, the party alleging the modification must show that the parties demonstrated both subjective and objective intent to be bound by the new contract's terms." <u>Fondedile, S.A. v. C.E. Maguire, Inc.</u>, 610 A.2d at 92 (citing <u>Smith v. Boyd</u>, 553 A.2d 131, 133 (R.I. 1989)).

In this case, the parties agreed that certain costs initially excluded under the Contract would be included in a "lump sum" as part of the GMP.  For Stonestreet, it obviated the need to distinguish between covered and uncovered costs, while Weybosset had the assurance that, without further modifications, the risk of General Condition cost overruns was born by Stonestreet.  The change was documented in Exhibit No. 1 to the Contract, Ex. 1 at SS038840, and the parties conducted themselves accordingly throughout the entire initial Contract period.  Weybosset now seeks to exclude Stonestreet's secretarial and estimation costs incurred after the initial Contract period ending on November 26, 2008, on the ground that the Contract expressly precludes Stonestreet from

charging those costs to Weybosset. Weybosset Mem. at 43. However, as addressed herein in some detail, the Contract period was significantly extended with the consent of Weybosset, as documented in approved CORs for time extensions. In addition, the Project was significantly delayed by the lack of primary power and certain engineering designs, both of which fell within Weybosset's responsibilities. Moreover, Patrick's uncontroverted testimony and the detailed documentation in Stonestreet's Timberline reports attached to the Requisitions for Payment - which, except for the amounts in dispute, Weybosset paid without objection - establish that the parties agreed to modify the Contract by allowing secretarial and estimating costs to be included in General Conditions. Weybosset's posttrial contention that such costs were expressly prohibited by the Contract is inconsistent with the way the parties conducted themselves throughout the initial Contract period. As such, Weybosset's objection to the inclusion of such costs based on the provisions in Subsection 6.2.1 was waived when it consented to the conversion of the General Conditions to a "lump sum."

Weybosset also objects to Stonestreet's inclusion of $182,956 into its request for extended General Conditions in charges incurred after March 20, 2009 on the grounds that such charges are (a) prohibited under the Contract, (b), they have already been paid by Weybosset, and/or (c) they have no causal relation to the delay, Weybosset Mem. at 43, or are outside the delay period. Id. at 46. With respect to the first ground, Weybosset essentially reiterates

its argument that personnel costs could not be charged to Weybosset because Stonestreet no longer had an office at the Project site after issuance of the final COO. As determined herein, in light of the parties' agreement to include  certain charges in General Conditions, those contractual provisions cannot serve to exclude those charges *per se.*

As its second ground, applicable to $12,367 in insurance costs, Weybosset contends that this charge had been previously included in General Conditions and had been paid. At trial, Patrick agreed that the total cost of insurance ($123,772) was included in the lump sum of $809,888, which had been paid by Weybosset. Tr. vol. 3, 83:12-84:25. He suggested, that the additional amount had "hit the job" later and that the accounting system apportioned the insurance costs to the Project through November 25, 2008, but conceded that he would have to "talk to accounting and find out how they apportioned that cost." Id. 85:6-24.  As such, the evidence was insufficient to support Stonestreet's claim for this item and it will be excluded from the calculation of damages.

With respect to the third ground, Weybosset focuses on $38,654 assessed by Stonestreet for dumpster charges and $85,293 in clean-up costs. COR 12A for additional General Conditions between 2/25/09 to 4/15/09 reflected charges of $11,465 for dumpsters provided by Clyde Roll-Off Containers ("Clyde").  Ex. 76 at SS0077425. In COR 127 for extended General Conditions beyond November 25, 2008, Stonestreet included a total of $38,654 in dumpster charges. Ex. 96. When asked to explain the different amounts, Patrick stated at

trial that Clyde provided the dumpsters throughout the Project, Tr. III 87:1-4, and that the charges were based on the weight of the dumpsters when they were hauled away.   Tr. vol. 2, 169:20-25. According to Patrick,  the larger charge in COR 127 was due to an invoice that was in Stonestreet's pending system and that was not reflected in the earlier job cost report. Id. 91:14-19. Patrick also stated that, although the delay in the Project may not have created additional trash, associated change orders could. Id. at 92:14-23. He also explained that the charges for the dumpsters were incurred after November 25, 2008, the initial period for the "lump sum" General Conditions. Tr. II 169:1-4, 12-14.

In light of Patrick's undisputed explanation of how the dumpster charges were incurred, the information provided in COR 127A and COR127, as supported by backup information, and in the absence of any suggestion by Weybosset that (1) Clyde did not perform the work, (2) Clyde did not bill Stonestreet for the work as reflected in Stonestreet's Timberline system, or (3) Weybosset already paid for the charges, the fact that the delay, by itself, may not have resulted in additional debris is not decisive on this issue.  Dumpster charges were included in General Conditions until November 25, 2008, the anticipated end date of the Project. The fact that the Project was delayed by an additional four months lends credence to Stonestreet's claim for such charges and, as noted, there was no testimony disputing Stonestreet's claim that the dumpster service was actually provided after November 25,2008.

Weybosset also asserts that the job clean-up costs of $61,462

included in COR 127 for extended General Conditions should be disallowed because (1) job clean-up charges of $85,293 were included in the original "lump sum" General Conditions and (2) Patrick acknowledged at trial that that "lump sum" had been paid in full. Weybosset's argument on this claim fails to demonstrate that those charges were not legitimate. The "lump sum" General Conditions were assessed to pay certain of Stonestreet's cost during the initial Contract period, which was subsequently extended (1) because primary power was delivered months late and certain final designs were incomplete, and (2) based on approved CORs which requested time extensions. Under those circumstances, and in the absence of _any_ testimony or evidence that the job clean-up tasks reflected in the Timberline system - which Weybosset accepted as supporting backup throughout the initial Contract period - were not performed or billed to Stonestreet as indicated, or that Weybosset already paid for those charges, the requested amount of $61,462 will be included in Stonestreet's claims. For those reasons, the Court finds that, with the exception of the insurance charge of $12,367, Stonestreet is entitled to the amount of $469,752 requested for Extended General Conditions in COR 127. ($482,119 - $12,367 = $469,752).

### F.   The $122,977 in Subcontractor Discounts

It is undisputed that Weybosset paid a sum of $893,521.80 directly to Subcontractors, which settled, in full, the unpaid asserted Subcontractors' costs of $1,016,499.22. Stonestreet claims

to be entitled to the difference of $122,977.42[18] between the $1,016,499.22, which was included in the adjusted final GMP, and the $893,521.80 paid directly to Stonestreet's Subcontractors. See Ex. 108 for Stonestreet's calculation. Even after ten days of trial, it is still unclear whether the difference between Subcontractor costs as set forth in the Contract and the payments made by Weybosset is due solely due to negotiation by Weybosset with the Subcontractors (resulting in a "discount" to Weybosset), or whether the paid amounts were less than the amounts specified in Stonestreet's accounting system because they did not include a percentage fee or other type of contractor markup. Although it is correct that the adjusted final GMP included the $1,016,499.22, this entire amount reflected, at some point, debts owed to the Subcontractors which Stonestreet had elected not to pay. As documented by the lien waivers provided to Weybosset, the Subcontractors' claims were subsequently settled, in full, by their acceptance of a lesser amount paid by Weybosset. Ex. 1084 A-W. In other words, if Stonestreet had prevailed on its claim for the Subcontractors' costs of $1,016,499.22, this money would have

---

18

Although this figure had previously been presented as $222,977.42, it was clearly and meticulously established at trial that the larger figure was in error. In essence, a $100,000 payment to a supplier of Subcontractor R S Anctil Plumbing had been counted separately, instead of including it in the value of Anctil's Subcontract. Tr. vol. 7, 7:8 - 24:6 (Mar. 28, 2012). Cross examination of Ralph A. Palumbo, a certified public accountant testifying on behalf of Weybosset: Q: And there's a vendor discount section correct, the 222,977? A: Yes. Q: Based on the analysis we went through in connection with Exhibit 108, that should be 122,977? A: Correct. Id. at 24:1-6.

flowed through Stonestreet to the Subcontractors (as Stonestreet acknowledged by repeatedly representing in this litigation that, if paid such sums, it intended to pay the Subcontractors directly.) However, as supported by the Subcontractors' lien releases, Ex. 1084 A-W, no such debts are outstanding, and nothing presented at trial provided a justification for including $122,977.42 in Stonestreet's damages award.

At trial, Patrick explained that he calculated the difference by comparing the amounts actually paid to the Subcontractors and what was owed them according to Stonestreet's Timberline system. Tr. vol. 2, 64:16-20. He also indicated that (1) Stonestreet was entitled to such a "discount" under the payment provision of the Contract, and (2) Karam had indicated in his deposition that Weybosset did not intend to retain the Subcontractor discounts. Id. at 65:17-66:3. In its posttrial memorandum, Stonestreet suggested that Note 2 to the Final GMP, Ex. 1 at SS038840, lends support to its claim. Note 2 states as follows: "Any item marked GMP Budget will be used for budget purposes. If cost reductions are achieved, then all savings will go into a contingency account to be used for the General Contractor." Id.

The burden was on Stonestreet to demonstrate, by a preponderance of the evidence, that it was entitled to the "Subcontractor discount" which Weybosset had not paid to the Subcontractors. None of the explanations offered by Stonestreet are supported by evidence. If the discount represented, at least in part, the customary overhead and fees which Stonestreet added to

-58-

the cost of subcontracting out certain work, this connection was not drawn at trial. It was not conclusively established why the Subcontractors were willing to settle for less and there was no further explanation whether or how Note 2 to the GMP was actually implemented in the course of the Project. As noted by Palumbo, his review of the cost system found no evidence of a contingency account. Because the Court is of the opinion that this burden has not been met by Stonestreet, the amount of $122,977.42 will not be included in any damages award.

### G.   Stonestreet's Other Claims

In addition to its breach of contract claim, Stonestreet also raises claims of breach of the implied covenant of good faith and fair dealing (Count II), unjust enrichment (Count III), and tortious interference (Counts IV, V, and VI). The damages Stonestreet seeks in recovery on all these claims are based on CORs already included in its calculation for its asserted breach of contract damages.

With respect to Stonestreet's claim of breach of the duty of good faith and fair dealing, the claim is limited to asserting that Weybosset "act[ed] in a manner that is not consistent with the purposes of the Contract," Third Amended Complaint ¶ 26. Stonestreet's calculation of its damages related to this claim refers to COR 127 - Extended General Conditions (Ex. 96), for which it also seeks recovery under its breach of contract claim.  As such, it is redundant and duplicative of Stonestreet's breach of contract claim.

-59-

As to Stonestreet's unjust enrichment claim, under Rhode Island law, "[u]njust enrichment is an equitable doctrine that, <u>in the absence of an enforceable contract</u>, allows a plaintiff to recover a benefit transferred to a defendant if that defendant's ongoing possession would be inequitable." <u>Café La France, Inc. v. Schneider Sec., Inc.</u>, 281 F. Supp.2d 361, 375 (D.R.I. 2003)(citing <u>Doe v. Burkland</u>, 808 A.2d 1090, 1095 (R.I. 2002))(emphasis added). Specifically, Stonestreet alleges that Weybosset submitted, as part of its historic tax credit application, certain CORs which it then refused to pay.

Here, it is undisputed that the parties had a valid contract that governed their relationship and set forth their business obligations. Stonestreet's claims are based entirely on the Contract and the Court has determined that Stonestreet is entitled to recover for Weybosset's breach of the Contract. Under those circumstances, the unjust enrichment claim is duplicative and superfluous.

With respect to Stonestreet's claim for tortious interference, no evidence was submitted to prove that Weybosset's direct payments to Subcontractors - for work which they had performed, but for which they had not received payment from Stonestreet - constituted an intentional and wrongful interference by Weybosset with Stonestreet's Subcontracts. Under Rhode Island law, the elements of tortious interference with a contractual relationship are as follows:

"(1) the existence of a contract;

(2) the alleged wrongdoer's knowledge of the contract;

(3) his intentional interference; and

(4) damages resulting therefrom." <u>Jolicoeur Furniture Co. v. Baldelli</u>, 653 A.2d 740, 752 (R.I. 1995). Once the plaintiff establishes these elements, "'the burden of proving sufficient justification for the interference shifts to the defendant.'" <u>UST Corp. v. General Road Trucking Corp.</u>, 783 A.2d 931, 937 (R.I. 2001)(citation omitted).

In this case, it is undisputed that a number of Subcontractors placed liens on the Property because they had not been paid, and there was some testimony at trial suggesting that Subcontractors had not always been paid promptly after Stonestreet received a payment from Weybosset. Although Stonestreet was made aware of the liens, it chose to rely on the "pay-when-paid" provision rather than pay the Subcontractors what they were undisputably owed. No further evidence was submitted as to the circumstances under which Weybosset rid itself of the liens encumbering the Property or what damages Stonestreet suffered through Weybosset's alleged tortious interference. For those reasons, Stonestreet's claim of tortious interference, along with its claims of unjust enrichment and for breach of good faith and fair dealing, will be dismissed.

## IV.  Weybosset's Liquidated Damages Claim

This Court has previously set out the principles of enforcing a liquidated damages clause in the construction context. <u>ADP Marshall, Inc. v. Noresco, LLC</u>, 710 F.Supp.2d at 234-237.

First, such a provision is enforceable if, in the event of a

breach, the harm is "difficult to estimate" and the liquidated damages amount is a "reasonable forecast of the actual harm." Howarth v. Feeny, 1992 WL 813502 at *3 (R.I. Super. Jan. 15, 1992.) With respect to a construction delay, the loss is related to the value of the use of the property. ADP Marshall, Inc. v. Noresco, LLC, 710 F.Supp.2d at 234 (citing Psaty & Fuhrman, Inc. v. Housing Auth. of City of Providence, 76 R.I. 87, 68 A.2d 32, 38 (1949)).

Generally, a liquidated damages clause is not enforceable if the delay is "due in whole or in part to the fault of the pary claiming the benefit of such provision." Psaty & Fuhrman, Inc. v. Housing Auth. of City of Providence, 76 R.I. at 98, 68 A.2d at 38. In order to recover for a delay, a claimant must prove that (1) the delay affected activities on the critical path[19], and (2) the asserted delay was attributable only to the party from which the claimant seeks to recover. ADP Marshall, Inc. v. Noresco, LLC, 710 F.Supp.2d at 222 (citations omitted).

Finally, because the purpose of a liquidated damages clause is to compensate for loss, not to punish, such a provision is enforceable only when a loss has been sustained; otherwise, a liquidated damages provision amounts to an "unenforceable penalty." Howarth v. Feeny, 1992 WL 813502 at*3 (R.I. Super. Jan. 15, 1992); Restatement (Second) of Contracts §356 cmt(e)("If ... it is clear

---

[19]

As previously noted, the critical path, which is the longest in a network of interconnected paths representing the various activities of a project, determines a project's expected completion date. See Gulf Contracting, Inc. v. United States, 23 Cl.Ct. 525, 529 n.2 (Cl.Ct. 1991)

that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable.").

In its restated counterclaim (Docket # 56), although Weybosset did not explicitly assert claims for liquidated damages, Weybosset generally alleged that Stonestreet failed to timely complete the Project.[20]   Pursuant to Article 11 of the A121, the Work was to be completed according to the Project Schedule dated October 25, 2007, attached to the Contract as Exhibit No. 2, SS038847, which set the commencement of construction for November 15, 2007. Id. SS038848. Article 11 further provided that Stonestreet was to "obtain a complete and final certificate of occupancy within twelve (12) months of commencement of the construction phase of the Work," Ex. 1 p. 14, SS038803. Because issuance of the final COO did not occur until March 20, 2009, Weybosset sought 74 days of liquidated damages at $3,000 per day. Although Stonestreet presented a number of CORs signed by Landry, which extended the time period during which the work was to be completed, Weybosset suggested in its posttrial memorandum that Stonestreet was aware that Landry "had no authority to allow project time extensions." Weybosset Mem. 1 (Docket # 178).

At trial, Weybosset sought to support its claim for liquidated damages with the testimony of David Benoit ("Benoit"), a construction management services consultant. Benoit was offered by

---

[20]

At the close of trial, Weybosset conceded that it had presented no evidence with respect to its counterclaims of faulty work and those claims were dismissed at that time, leaving only the claim for liquidated damages. Tr. vol. 10, 38:7-20 (Apr.3, 2012).

Weybosset as an expert witness; however, his testimony was the subject of a motion *in limine* by Stonestreet. (Docket # 139). Benoit testified that he first visited the Property in January 2009, and again in February, March, and May of the same year. Tr. vol. 7, 51:6-52:17, 55:2-4. In preparation for mediation and, later, to determine whether Weybosset was entitled to liquidated damages, Benoit reviewed contracts, e-mails, other written correspondence, schedules and CORs. Id. 55:24-56:7.

With respect to construction of the electrical Vault, Benoit concluded that its completion was delayed by 46 days and that the delay was attributable to Stonestreet. Id. 76:3-11. Benoit's conclusion was arrived at by reviewing Project documentation, bills from Subcontractors to Stonestreet, CORs, and Stonestreet's schedules. Id. 61:14-23. In essence, Benoit subtracted the number of days planned for construction of the Vault from the number of days actually spent on construction and concluded that the difference was delay attributable to Stonestreet. Id. 75:22-76:4, Ex. 1146.

Similarly, regarding the installation of the fire stairs and elevator pressurization, Benoit reviewed documentation to verify "when activities were occurring and who was responsible for those activities," id. 77:6-15, and then counted the number of days to arrive at a conclusion as to the length of the delay. Benoit candidly agreed, upon questioning by the Court, that "anybody with an intimate familiarity with the records in this case could do the same thing." Id. 78:15-24. Benoit performed the same analysis

before concluding that delays in the installation of windows, drywall, and masonry were attributable to Stonestreet; he conceded, however, that he performed no analysis regarding the cause of delay with respect to the fire pump installation. <u>Id.</u> 88:19-22.

In sum, Benoit concluded that Stonestreet was responsible for construction delays on the Project because they were obligated to perform certain construction activities within a particular time frame, but that those activities were delayed. <u>Id.</u> 95:14-23. Although Benoit explained how he arrived at his conclusion regarding the lengths of the various delays and why he attributed those delays to Stonestreet, he conceded[21] that he did not employ a critical path analysis. As such, his testimony is not sufficient to establish that the delay was not due "in whole or in part to the fault" of Weybosset. <u>Psaty & Fuhrman, Inc. v. Housing Auth. of City of Providence</u>, 76 R.I. at 98, 68 A.2d at 38.

Moreover, based on Benoit's own statement at trial, no particular expertise - other than familiarity with the facts - was required to calculate the days of construction delay and to ascertain who was responsible for performing a specific activity. As such, Benoit's testimony falls short of the standard set by Rule 702 of the Federal Rules of Evidence, pursuant to which a qualified expert witness may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand

---

[21]

At his March 8, 2011 deposition, Benoit stated that he did not perform a critical path analysis. Stonestreet's Mot. <em>in limine</em>, Docket # 139-1 at 2, Benoit Deposition Tr. 142:24-143:1 (Mar. 8, 2011).

the evidence or to determine a fact in issue." Fed. R. Evid. 702. No such technical or specialized knowledge was necessary, and no "reliable principles and methods" were employed to produce Benoit's conclusions. Id.

Even if, however, Benoit's testimony had been based on the necessary analyses and had assisted in establishing that Stonestreet had caused the delay for which Weybosset now seeks to be compensated, Weybosset did not provide any evidence at trial regarding what losses, if any, it sustained as a result of such delay. Enforcement of the liquidated damages clause in the absence of a proven loss would be an "unjust and unnecessary remedy." Restatement (First) of Contracts § 339, cmt a. to Subsection (1).

## V.   Prejudgment Interest

Stonestreet seeks prejudgment interest on compensatory damages awarded on its breach of contract claim and it asserts that such damages began to accrue on June 13, 2009, *i.e.* 25 days after the date it submitted its last requisition for payment. The Contract provides that "[p]ayments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rates as the parties may agree upon in writing or, in the absence thereof, the legal rate prevailing from time to time at the place where the Project is located." Contract § 13.6.1., Ex. 1 SS038835. No other writing has been submitted that sets forth a specific interest rate for an unpaid balance due under the Contract; therefore, the interest rate set by Rhode Island Statute applies.

As noted by the Rhode Island Supreme Court, "[p]rejudgment

interest 'serves two purposes: it promotes early settlements, and more importantly, it compensates persons for the loss of use of money that was rightfully theirs.'" Blue Ribbon Beef Co., Inc. v. Napolitano, 696 A.2d 1225, 1230 n. 3 (R.I. 1997)(quoting Murphy v. United Steelworkers of America Local No. 5705, AFL-CIO, 507 A.2d 1342, 1346 (R.I. 1986)).

Pursuant to R.I. Gen. Laws §9-21-10, "[i]n any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued..." Provided "the dates of the plaintiffs' onset of actual damages [have been] clearly identified," the accrual date is the date on which the plaintiff "actually began to suffer damages." Buckley v. Brown Plastics Mach., LLC, 368 F.Supp.2d 167, 170 (D.R.I. 2005); Gupta v. Customerlinx Corp., 385 F.Supp.2d 157, 167 (D.R.I. 2005)(concluding that prejudgment interest is based on "'the date from which Plaintiff's damages actually began, or put another way, from the point at which he was entitled to his money, and did not receive it.'")(quoting Buckley v. Brown Plastics Mach., LLC, 368 F.Supp.2d at 170).

Stonestreet's last requisition for payment, Application #17, was submitted on May 19, 2009. Ex. 81. Section 7.1.3 of the Contract provides:

> "[p]rovided an Application for Payment is received by the Owner not later than the 25th day of a month, the Owner shall make payment to the Construction Manager not later than the 25h day of the next month provided that

-67-

the Application for Payment is approved by the Owner, Architect and the Owner's lender. If an Application for Payment is received by the Owner after the application date fixed above, payment shall be made by the Owner not later than 25 days after the Owner receives the Application for Payment provided that the Owner, Architect and Owner's lender approves the Application for Payment." § 7.1.3, Ex. at SS038799.

Like prior requisitions for payment, Application # 17 reflects Stonestreet's position that the GMP was increased by additional sums pursuant to approved change orders. Ex. 81 SS0087923. In support of its application, Stonestreet submitted printouts from its Timberline accounting system that detailed the sums due for work performed on the Project. Ex. 81, SS0087924 - SS0087941. Given the Court's determination herein that Weybosset was required to pay Stonestreet based on the GMP as increased by the amounts set forth in allowed and pending CORs, as well as changes in Allowances and extended General Conditions, interest on Stonestreet's established claims became due no later than June 13, 2009.[22]

## VI. Attorneys Fees

Stonestreet claims to be entitled to an award of attorneys fees and costs on the grounds that (1) Weybosset offered no defense for its alleged breaches of contract, and (2) Weybosset advanced an entirely unsupported counterclaim. Weybosset, on its part, claims that it is entitled to an award of attorney fees and costs because it was forced to address Stonestreet's claim to $1.6 million in

---

[22]

Although the Application was approved by the Architect on May 19, 2009, the requisition relates to the period up to April 15, 2009. Thus, it was clearly not submitted before the 25th of the month and the second provision of Section 7.1.3 applies.

damages, which included $893,000 of Subcontractor costs that had indisputably been paid by Weybosset (or on Weybosset's behalf).

The burden on a party seeking an award of attorney fees in breach of contract cases is a heavy one. Under Rhode Island law, "[t]he court may award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court . . . [f]inds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party." R.I. Gen. Laws § 9-1-45. "[T]he award of attorney's fees rests within the sound discretion of the trial justice." Women's Dev. Corp. v. City of Central Falls, 764 A.2d 151, 162 (R.I. 2001). However, "attorney's fees are awarded only if a Court determines that 'there was a complete absence of a justiciable issue of either law or fact.'" Ross-Simons of Warwick, Inc. v. Baccarat Inc., 66 F.Supp.2d 317, 331 (D.R.I. 1999)(quoting UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp., 641 A.2d 75, 80 (R.I. 1994)); Bucci v. Anthony, 667 A.2d 1254, 1256 (R.I. 1995)(court's determination to award attorney's fees in "absence of a justiciable issue raised by the losing party ... is discretionary.").

In this case, both parties prevailed only on some of their respective claims. Stonestreet maintained that it was entitled to $1.6 million in damages, but had to concede that it did not make $893,000 in Subcontractor payments that were included in Stonestreet's calculations. Stonestreet also claimed $122,977.42 in Subcontractor discounts, but failed to provide convincing evidence that it was entitled thereto. Weybosset, on the other hand,

asserted a liquidated damages claim under the Contract, but was unable to prove that Stonestreet caused an unexcused construction delay or that Weybosset had suffered damages as a result of such delay.

While both parties engaged in extensive and, frequently, contentious discovery in preparation of this litigation, they had ample opportunities to evaluate the respective merits of their claims. Nevertheless, neither party was willing to concede that one or more of its significant claims lacked legal and/or evidentiary support, which resulted in considerable motion practice and a lengthy and, no doubt, costly trial. Under those circumstances, the Court is of the opinion that an award of attorney's fees is not indicated for either party.

## Conclusion

This Court has noted before, in a similar construction dispute, that to address each and every claim by the parties is beyond the capability of a trial. <u>ADP Marshall, Inc. v. Noresco, LLC</u>, 710 F. Supp. 2d at 246. To the extent some of the parties' particular disagreements have not been discussed herein, the Court has determined that they were not material to the parties' respective claims or to the Court's analysis.

After listening to the testimony of eleven witnesses over a 10-day period, and after reviewing more than 160 exhibits, including multi-page computer printouts, summaries, charts, and drawings, the Court finds that Stonestreet has sufficiently supported its case for breach of contract. The evidence submitted

at trial established that Weybosset awarded a general contractor bid to Stonestreet which, from the beginning, exceeded Weybosset's budget. The parties made an effort to reduce the cost of construction by "value engineering," i.e. using less expensive materials, employing non-union labor, and foregoing some of the costlier features originally planned. Nevertheless, as is almost always the case in a construction project, particularly one involving the renovation of a historic property and the incorporation of a newly constructed unit, unforseen events led to time delays and additional costs. At some point near the end of the Project, Weybosset refused to pay Stonestreet for work changes that had already been approved and that had been satisfactorily performed. Stonestreet, in reliance on the pay-when-paid provision in its Subcontracts, ceased paying Subcontractors for such work, and the Subcontractors sought to enforce payment by placing liens on the Property. Weybosset, likely under pressure to have those liens removed promptly, but still refusing to pay Stonestreet so it could, in turn, pay its Subcontractors, elected to negotiate with the Subcontractors directly. Although the exact circumstances of such payments was not further explored at trial, it is undebatable that Weybosset settled the Subcontractors' claims at a substantial discount.

The delay in the Project was caused by two significant issues. First, the connection of permanent power to the building, anticipated to occur in the summer of 2008, was not finalized until sometime in January 2009. Although temporary power was provided

throughout the Project, it was inadequate, particularly in the colder season, and certain finishing work could not be completed. Moreover, the fire protection and life safety system could not be tested, precluding issuance of the final COO. As was established at trial, pursuant to the Contract, Stonestreet was not responsible for certain design or engineering tasks, particularly with respect to the electrical Vault and the fire alarm system. Because those designs had not been finalized by the time they were needed, the Project suffered further significant delays with respect to critical activities which precluded issuance of the COO until nearly four months after the anticipated date therefore. Although Stonestreet had not received payment for work that had already been performed, it continued to work on the Project, generating additional costs for which it has not been compensated.

For the reasons stated herein, the Court decides as follows:

(1) Judgment shall enter in favor of Stonestreet on its Breach of Contract claim (Count I). Stonestreet is awarded damages as set forth in the table below, together with prejudgment interest as specified herein.

(2) Stonestreet's claims based on Breach of the Covenant of Good Faith and Fair Dealing (Count II), Unjust Enrichment (Count III), Tortious Interference with Contractual Relations (Counts IV - VI), and Indemnification (Count VII) are dismissed.

(3) Weybosset's Counterclaims for Breach of Agreement (Count I), Indemnification (Count II), Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III), Breach of Fiduciary Duty

(Count IV), as well as its claim for liquidated damages are dismissed in their entirety.

(4) Prejudgment interest on the damages awarded to Stonestreet shall be calculated on a commencement date of June 13, 2009.

(5) No attorneys fees are awarded to either party.

## Calculation of Damages Award

| Original GMP | $11,250,000 |
|---|---|
| Approved Changes | $838,476 |
| Allowance Changes | $38,240 |
| Scope Increases | $518,773 |
| Payments to Stonestreet | ($11,057,396) |
| Settlement of Subcontractor Debt | ($1,016,498) |
| **Total Damages Award to Stonestreet** | **$571,595** |

Judgment in this case shall enter following a resolution of Allstate's claim against Stonestreet and Stonestreet's counterclaim, which remain pending at this time. Allstate and Stonestreet are directed to submit memoranda of no more than twenty (20) pages per party within fourteen days of this Decision and Order.


SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi
Chief United States District Judge

October 31, 2012